IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

USCA Case No. 20-11719-H
United States District Court, Southern District of Florida
Case No.: 0:19-CIV-81692-RAR

RAYMOND JAMES FINANCIAL SERVICES, INC.,

Appellant,

v.

ADA SERENA CORDOVA ARMIJOS, ET AL.,

Appellees.

## APPELLEES' ANSWER BRIEF

KRISTEN M. FIORE, B.C.S. (25766)
AKERMAN LLP
201 E. Park Ave., Suite 300
Tallahassee, Florida 32301
Telephone:  (850) 224-9634
Facsimile:   (850) 222-0103
kristen.fiore@akerman.com

FRANCISCO A. RODRIGUEZ (653446)
SANDRA MILLOR (13742)
ANDREW J. DOMINGUEZ (112891)
AKERMAN LLP
Three Brickell City Centre
98 SE 7th Street, Suite 1100
Miami, Florida 33131
Telephone:  (305) 982-5591
Facsimile:   (305) 374-5095
francisco.rodriguez@akerman.com
sandra.millor@akerman.com
andrew.dominguez@akerman.com

*Attorneys for Appellees*

USCA Case No. 20-11719-H

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT PURSUANT TO FRAP 26.1 AND 11TH CIR. R. 26.1-1

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, Appellees Ada Serena Cordova Armijos, *et al*., by and through their undersigned counsel, hereby discloses the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock:

1. Abreu de Lima, Ramon (Claimants' Counsel in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

2. Akerman LLP (Counsel for Appellees)

3. Albornoz Vorbeck, Sylvia (Appellee)

4. Almeida Garcia, María Isabel (Appellee)

5. Almeida Garcia, Mónica Catalina (Appellee)

6. Andrade Jarrin, María Gabriela (Appellee)

7. Andrade Zambrano, Linda (Appellee)

8. Arcos Darquea, Maria Margarita (Appellee)

USCA Case No. 20-11719-H

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

9.   Arellano Fernandez, Eugenio (Appellee)

10.  Armijos Torres, María Teresa (Appellee)

11.  Arregui Yarza, Antonio (Appellee)

12.  Arteta, Rosa Ines (Appellee)

13.  Ayala, Guadalupe Bernardina (Appellee)

14.  Aylwin Eguiguren, Ana Catalina (Appellee)

15.  Basantes C., Angel A. (Appellee)

16.  Benitez, Eduardo Anibal (Appellee)

17.  Birnberg, Gary Frederick (Arbitrator from related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc.*, Arbitration No. 18-02934)

18.  Bobadilla, Gabriella (Appellee)

19.  Bonilla Moyano, Hugo Hernan (Appellee)

20.  Bueno Martinez, Fernando (Appellee)

21.  Bueno Pallares, Ana Luz (Appellee)

22.  Bueno Pallares, María Fernanda (Appellee)

23.  C. Recalde, Carlos Ivan (Appellee)

24.  Cadena Huertas, Fabiola Jakeline (Appellee)

25.  Calderon Chiriboga, Eulalia de las Mercedes (Appellee)

C-2

USCA Case No. 20-11719-H

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

26. Calderon Chiriboga, Nora Susana (Appellee)

27. Calderon Medina, Erika Elizabeth (Appellee)

28. Calderón Segovia, Hernán Patricio (Appellee)

29. Calisto Albornoz, Diego Xavier (Appellee)

30. Calisto Arteta, Diego Javier (Appellee)

31. Calvache Ulloa, Elsa Magdalena (Appellee)

32. Calvache Ulloa, Gladys Rosario (Appellee)

33. Calvache Ulloa, Marcia Cecilia (Appellee)

34. Campuzano Arteta, Álvaro (Appellee)

35. Campuzano, Patricio E. (Appellee)

36. Cargi Business Corp. (Appellee) ("Cargi Corp.") is a company incorporated under the laws of the British Virgin Islands, with its principal business address in Quito, Ecuador. Zarina Jovanka Massi Aguirre is the legal representative of Cargi Corp. No publicly traded corporation directly owns 10% or more the stock of Cargi Corp.

37. Carrera Loza, Rubén Darío (Appellee)

38. Carrera Segovia, Gonzalo David (Appellee)

39. Castillo Vallejo, Luis Eduardo (Appellee)

40. Castillo, Segundo (Appellee)

41. Cervantes, Elva Dalia (Appellee)

C-3

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

42.    Cevallos Silva, Herrman Gonzalo (Appellee)

43.    Coba Vinelli, Erika Johana (Appellee)

44.    Coba Vinelli, Paola Gabriela (Appellee)

45.    Conferencia Episcopal Ecuatoriana (Appellee) ("Conferencia Episcopal") is an organization incorporated under the laws of Ecuador. Conferencia Episcopal is headquartered in Canto Quito, Pichincha province. Monsignor Eugenio Arellano Fernandez is the legal representative of Conferencia Episcopal. No publicly traded corporation directly owns 10% or more the stock of Conferencia Episcopal.

46.    Consejo Gubernativo de Bienes Diocesanos Tulcán (Appellee) ("Consejo Diocesanos Tulcán") is an organization incorporated under the laws of Ecuador. Monsignor Fausto Feliciano Gaibor Garcia is the legal representative of Consejo Diocesanos Tulcán. No publicly traded corporation directly owns 10% or more the stock of Consejo Diocesanos Tulcán.

47.    Construction Management Solution, Inc. (Appellee) ("CMS") is a company incorporated under the laws of the British Virgin Islands. CMS has its registered office in the British Virgin Islands, and its books and records in Quito, Ecuador. Fabian Yar is the legal representative

C-4

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

of CMS.  No publicly traded corporation directly owns 10% or more

the stock of CMS.

48.    Cordova Armijos, Ada Serena (Appellee)

49.    Cordova Armijos, Paula Tatiana (Appellee)

50.    Cordova Cevallos, Angel Eduardo (Appellee)

51.    Cordova Cevallos, Luis Antonio (Appellee)

52.    Cordova, Jose Adrian (Appellee)

53.    Cordova, Jose Luis (Appellee)

54.    Correa Holguin, Francisco (Appellee)

55.    Cortes Safadi, Paola Asunción (Appellee)

56.    Darquea Moncayo, Hector Hugo (Appellee)

57.    Darquea, Maria Gabriela (Appellee)

58.    Davila Proano, Germanico Javier (Appellee)

59.    del Solar, Manuel Ignacio (Appellee)

60.    del Solar, Maria Daniela (Appellee)

61.    DLA Piper LLP (US) (Counsel for Appellant)

62.    Dominguez, Andrew J. (Counsel for Appellees)

63.    Duran Vaca, Mónica del Carmen (Appellee)

64.    Esparza Cisneros, James Manuel (Appellee)

65.    Espín Tello, María Celina (Appellee)

53684449;4

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

66.    Estate of Washington Eduardo Almeida Flores (Appellee)

67.    Fabens-Lassen, Benjamin (Counsel for Appellant)

68.    Fiore, Kristen M. (Counsel for Appellees)

69.    Founderz Group Limited (Appellee) ("Founderz") is a company incorporated under the laws of the British Virgin Islands. Founderz has its registered office in the British Virgin Islands, and its books and records in Quito-Pichincha, Ecuador. Edwin Torres is the legal representative of Founderz. No publicly traded corporation directly owns 10% or more the stock of Founderz.

70.    Galarraga Moreno, Maria Augusta (Appellee)

71.    Garcia Gualpa, Edison (Appellee)

72.    Goerke, Steven Gerard (Chairperson Arbitrator from related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

73.    Good, Douglas Ray (Appellee)

74.    Helou Cevallos, Carlos Salomon (Appellee)

75.    Helou Pinto, Carlos Jamil (Appellee)

76.    Hernandez Lalama, Maria Alexandra (Appellee)

77.    Hernandez Lalama, Maria Gabriela (Appellee)

53684449;4

USCA Case No. 20-11719-H

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

78. Iavarone, Nicholas P. (Counsel for Insight Securities, Inc. in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

79. Insight Securities, Inc. (party Respondent in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

80. Jaramillo Arias, Hernán Antonio (Appellee)

81. Kennedy, Dominique (Appellee)

82. Kennedy, Edward Jonathan (Appellee)

83. Kennedy, Maria (Appellee)

84. Kingvi Group, S.A. (Appellee) ("Kingvi") is a company incorporated under the laws of the island of Nevis. Juan Sebastian Vinelli Ayala is the legal representative of Kingvi. No publicly traded corporation directly owns 10% or more the stock of Kingvi.

85. Lalama Crespo, Elsa Magdalena (Appellee)

86. Ledesma Gandara, Rodrigo Mauricio (Appellee)

87. Ledesma Mariscal, Eduardo Enrique (Appellee)

88. Lopez Viteri, Gilmer Rodrigo (Appellee)

53684449;4

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

89.    Lopez Yanez, Martha Eugenia (Appellee)

90.    Lucero, Fernando Ivan (Appellee)

91.    Ludena Granja, Jose Roberto (Appellee)

92.    Ludena León, Tarquino Napoleón (Appellee)

93.    Luna Gaibor, Laura Haydee (Appellee)

94.    Luna Gaibor, Monica Iveth (Appellee)

95.    Magson Portfolio Corp. (Appellee) ("Magson") is a company incorporated under the law of Panama. Magson has its registered office in Panama, and its books and records in Quito, Ecuador. Juan Oswaldo Vinelli Aguirre is the legal representative of Magson. No publicly traded corporation directly owns 10% or more the stock of Magson.

96.    Marcial, Cecilia Y. (Appellee)

97.    Medina Calderon, Walter Eduardo (Appellee)

98.    Megarmi, S.A. (Appellee) ("Megarmi") is a company incorporated under the laws of the British Virgin Islands. Megarmi has its registered office in the British Virgin Islands, and its books and records in Quito, Ecuador. Juan Oswaldo Vinelli Aguirre is the legal representative of Megarmi. No publicly traded corporation directly owns 10% or more the stock of Megarmi.

99.    Meneses Espinosa, Xavier Federico (Appellee)

C-8

53684449;4

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

100.  Millor, Sandra J. (Counsel for Appellees)

101.  Mina, Silvino (Appellee)

102.  Montalvo Canelos, Fabian Enrique (Appellee)

103.  Mosquera, Rebeca (Claimants' Counsel in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

104.  Naranjo, Jose Victorian (Appellee)

105.  Narvaez Chacon, Ana del Carmen (Appellee)

106.  Ochoa Egas, Gladys Margarita (Appellee)

107.  O'Hagan Meyer LLC (Counsel for Insight Securities, Inc. in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

108.  O'Quinn, Ryan (Counsel for Appellant)

109.  Ortega Carrion, Edgar Fabian (Appellee)

110.  Ortega Salazar, Paul Patricio (Appellee)

111.  Paez Puga, Francisco Xavier (Appellee)

112.  Pallares Meneses, Ana Luz (Appellee)

113.  Pallares, Jose Antonio (Appellee)

C-9

USCA Case No. 20-11719-H

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

114.    Pallares, Maria Gabriela (Appellee)

115.    Pazmiño, Luz Elvira (former Defendant from trial court action; former Claimant in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

116.    Perez Espinoza, Elena del Carmen (Appellee)

117.    Peroni Marchina, Giorgio (Appellee)

118.    Pinto Vela, Xavier (Appellee)

119.    Ramón Banderas, Rocío del Consuelo (Appellee)

120.    Raymond James & Associates, Inc. (party Respondent in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

121.    Raymond James Financial Services, Inc. (Appellant)

122.    Reinhart, Honorable Bruce E. (United States Magistrate Judge)

123.    Reyes Fierro, Miguel Angel (Appellee)

124.    Rodriguez Miranda, Guillermo Aníbal (Appellee)

125.    Rodriguez, Francisco A. (Counsel for Appellees)

126.    Roh Lopez, Francisco (Appellee)

C-10

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

127. Rohan, Sean G. (Counsel for Insight Securities, Inc. in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc.*, Arbitration No. 18-02934)

128. Rubio Garcia, Irma Ileana (Appellee)

129. Ruiz, II, Honorable Rodolfo A. (United States District Judge)

130. Saint Salvatore Ltd. (former Defendant from trial court action; former Claimant in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc.*, Arbitration No. 18-02934)

131. Sandoval Cerda, Marcia Gisella (Appellee)

132. Sandoval, Karen Elizabeth (Appellee)

133. Sevilla-Sharon, Maia (Counsel for Appellant)

134. Tapia Bermudez, Natalie Alexandra (Appellee)

135. Teran Burbano, Monica Susana (Appellee)

136. The Iavarone Firm, P.C. (Counsel for Insight Securities, Inc. in related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc.*, Arbitration No. 18-02934)

137. Toledo Romoleroux, Jaime Antonio (Appellee)

C-11

USCA Case No. 20-11719-H
*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

138.  Torres Mino, Edwin Alberto (Appellee)

139.  Tran Tang, Hue Linh (Appellee)

140.  Troncoso Garrido, Ana Maria (Appellee)

141.  Troya de Kennedy, America Alicia (Appellee)

142.  Trujillo Grijalva, Ramiro Alfonso (Appellee)

143.  Valencia Llerena, Pablo Esteban (Appellee)

144.  Valenzuela Endara, Tanya Patricia (Appellee)

145.  Vallejo Tejada, Lucia Alexandra (Appellee)

146.  Vásquez Dávalos, Diego Fernandez (Appellee)

147.  Vásquez Perez, Maria Daniela (Appellee)

148.  Vásquez, Maria Alegria (Appellee)

149.  Vásquez, Maria Bernarda (Appellee)

150.  Vásquez, Maria Cristina (Appellee)

151.  Vela Barragán, Ines Fabiola (Appellee)

152.  Velazquez-Rivas, Isadora (Arbitrator from related FINRA arbitration, styled *Armijos, et al. v. Raymond James & Associates, Inc.; Insight Securities, Inc.; and Raymond James Financial Services, Inc.*, Arbitration No. 18-02934)

153.  Vergara Araque, Hugo Patricio (Appellee)

C-12

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

154.  Vicariato Apostolico de Esmeraldas Misión Comboniana (Appellee)
("Vicariato") is a religious organization incorporated under the laws of
Ecuador.  Vicariato has its registered office and books and records in
Esmeraldas, Ecuador.  Montsignor Eugenio Arellano Fernandez is the
legal representative of Vicariato.  No publicly traded corporation
directly owns 10% or more the stock of Vicariato.

155.  Villamar Espín, Ana Patricia (Appellee)

156.  Villamar Espín, Inés Ximena (Appellee)

157.  Villamar Espín, Paulina Cecilia (Appellee)

158.  Vinelli Aguirre, Juan Oswaldo (Appellee)

159.  Vinelli Aguirre, Sonia Violeta (Appellee)

160.  Vinelli, Soledad (Appellee)

161.  Vivanco, Gonzalo (former Defendant from trial court action; former
Claimant in related FINRA arbitration, styled *Armijos, et al. v.
Raymond James & Associates, Inc.; Insight Securities, Inc.; and
Raymond James Financial Services, Inc*., Arbitration No. 18-02934)

162.  Wayco, Stefanie M. (Counsel for Raymond James & Associates, Inc.
in related FINRA arbitration, styled *Armijos, et al. v. Raymond James
& Associates, Inc.; Insight Securities, Inc.; and Raymond James
Financial Services, Inc*., Arbitration No. 18-02934)

C-13

USCA Case No. 20-11719-H

*Raymond James Financial Services, Inc. v. Ada Serena Cordova Armijos, et al.*

    163.   Weiss, Terry R. (Counsel for Appellant)

    164.   Wiecher Knaak, Ute  (Appellee)

    165.   Wong Tran, James (Appellee)

    166.   Wong Tran, Karen (Appellee)

    167.   Yans Constante, Ana C. (Appellee)

    168.   Yar, Fabian (Appellee)

53684449;4

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellees respectfully submit that oral argument is not necessary in this case. This case involves straightforward legal issues that are adequately addressed in the parties' briefs.

53684449;4

## **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND

    CORPORATE DISCLOSURE  STATEMENT ..................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF CONTENTS......................................................................... ii

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF JURISDICTION...............................................................1

STATEMENT OF THE ISSUE..................................................................2

STATEMENT OF THE CASE..................................................................2

    *Nature Of The Case* ...................................................................2

    *Factual Background* ...................................................................4

        A. Chatburn Solicits the Investors and Their Investment Finder...................4

        B. Chatburn Touts his Relationship with "Raymond James" .........................5

        C. Chatburn Represents Himself to be a "Raymond James" Advisor ...........7

        D. The Meaning of "Raymond James"..........................................9

    *FINRA Arbitration* ...................................................................9

    *District Court Litigation* ...................................................................10

    *This Appeal* ...................................................................13

    *Standard Of Review* ...................................................................15

53684449;4

SUMMARY OF THE ARGUMENT ................................................................15

ARGUMENT ................................................................................................17

    I.    THE DISTRICT COURT ACTED WELL WITHIN ITS
        BROAD DISCRETION IN CONCLUDING THAT RJFS
        DID NOT HAVE A SUBSTANTIAL LIKELIHOOD OF
        SUCCESS ON THE MERITS OF RJFS'S ARGUMENT
        THAT DEFENDANT'S CLAIMS ARE NOT
        ARBITRABLE UNDER RULE 12200 OF THE FINRA
        CODE.....................................................................................17

        A. *Legal Standard*.................................................................17

        B. *The District Court did not abuse its broad discretion in
           determining RJFS failed to show it had a substantial
           likelihood of success on its claim that the Investors were
           not "customers" of RJFS and Chatburn for purposes of
           Rule 12200* ........................................................................20

        C. *The District Court did not abuse its broad discretion in
           determining RJFS failed to show it had a substantial
           likelihood of success on its claim that Chatburn was not
           an "associated person" of RJFS for purposes of Rule
           12200* ................................................................................25

        D. *At a minimum, courts should defer to the Arbitration
           panel's interpretation of its own rules* ...............................36

    II.  RJFS DID NOT SATISFY THE REMAINING
        PRELIMINARY INJUNCTION ELEMENTS......................................37

CONCLUSION.............................................................................................38

CERTIFICATE OF COMPLIANCE..............................................................39

CERTIFICATE OF SERVICE ......................................................................40

53684449;4

## TABLE OF AUTHORITIES

**Page**

## CASES

*Callahan v. U.S. Dep't of Health & Human Servs.*, 939 F.3d 1251,
    (11th Cir. 2019)..................................................................14

*Citadel Servicing Corp. v. Castle Placement, LLC*, 2019 WL 6909538,
    at *10 (S.D.N.Y. Dec. 19, 2019).......................................36

*Citigroup Global Markets, Inc. v. Abbar*, 761 F.3d 268 (2d Cir. 2014)............20, 21

*Crawford v. Barker*, 64 So. 3d 1246 (Fla. 2011).....................................18

*Deutsche Bank Sec., Inc. v. Ades*, No. 18-25142-CIV, 2019 WL 1077905
 (S.D. Fla. Mar. 7, 2019)...................................................19, 29

*Deutsche Bank Sec. Ins. v. Simon*, No. 19-20053-CIV, 2019 WL 4864465
 (S.D. Fla. Sept. 26, 2019)..................................................19, 28

*First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.*, 65 F.Supp.2d 1371
    (S.D. Fla. 1999)...........................................................29

*Forsyth Cty. v. U.S. Army Corps of Engineers*, 633 F.3d 1032 (11th Cir. 2011)....14

*Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014) ............21, 33

*Gray v. New York Life Ins. Co.*, 879 F. Supp. 99 (N.D. Ala. 1995) ......................23

*Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 n. 1 (11th Cir. 2017)......................33

*Lehman Bros., Inc. v. Certified Reporting Co.*, 939 F. Supp. 1333
    (N.D. Ill. 1996)..........................................................26, 33

*Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201 (2012)......................38

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) ..........................18

*Metlife Sec., Inc. v. Pizzano*, No. 09-CV-4459 (DMC-MF), 2010 WL 2545170
 (D.N.J. June 18, 2010) ......................................................35

iv

*Metro. Life Ins. Co. v. Puzzo*, 2014 WL 1817636
   (N.D. Ga. May 6, 2014) ..................................................................21

*\*MONY Securities Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir. 2004)..........*passim*

*Morgan Keegan & Co., Inc., v. Silverman*, 706 F.3d 562 (4th Cir. 2013) ..............21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ..........................................................................19

*\*Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364 (11th Cir. 2004) ...........*passim*

*Perry v. Thomas*, 482 U.S. 483 (1987) .................................................18

*\*Pictet Overseas, Inc. v. Helvetia Trust*, 905 F.3d 1183 (11th Cir. 2018).......*passim*

*Rolyn Cos., Inc. v. R & J Sales of Tex., Inc.*, 412 F. App'x 252
   (11th Cir. 2011)............................................................................23

*Sagepoint Fin., Inc. v. Small*, No. 15-CV-0571 DLI RML, 2015 WL
   2354330 (E.D.N.Y. May 15, 2015) ...............................................20

*Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223 (11th Cir. 2005).................18

*Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395 (E.D.N.Y. 2014).........................23

*Tucker v. Mukamal,* 616 F. App'x 969 (11th Cir. 2015).........................................25

*U.S. v. Endotec, Inc.*, 563 F.3d 1187 (11th Cir. 2009) ...........................................14

*Viyella v. Fundacion Nicor*, No. 20-11224-BB, 2020 WL 5755844
   (11th Cir. July 14, 2020)...............................................................25

*Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481
   (S.D. Fla. Feb. 28, 2020)..............................................................22

*Waterford Inv. Serv. v. Bosco*, 682 F.3d 348 (4th Cir. 2012)...........................27, 30

*Wheat, First Securities, Inc. v. Green*, 993 F.2d 814 (11th Cir. 1993) .............33, 34

v

## RULES AND REGULATIONS

11th Cir. R. 26.1-1 .................................................................C-1

11th Cir. R. 32-4 ....................................................................39

Fed. R. App. P. 26.1 ..............................................................C-1

Fed. R. App. P. 32(a)(5).........................................................39

Fed. R. App. P. 32(a)(6).........................................................39

Fed. R. App. P. 32(a)(7)(B) ...................................................39

Fed. R. App. P. 32(f).............................................................39

## OTHER PROVISIONS

FINRA  Rule 12200 ..........................................................*passim*

FINRA  Rule 12100(u)(2)...................................................*passim*

53684449;4

## STATEMENT OF JURISDICTION

As explained at length in Appellees' motion to dismiss this appeal, which this Court carried with the case by order dated October 5, 2020, this Court lacks subject matter jurisdiction over this appeal for two reasons: (1) this Court's precedent dictates that orders refusing to enjoin a party's participation in arbitration are not appealable; and (2) this appeal is moot because after Appellant initiated this appeal, Appellant consented to the arbitration panel's jurisdiction and agreed to be bound by the arbitration panel's decision.

While this Court previously issued a jurisdictional question related to the existence of diversity jurisdiction, Appellant amended its complaint to properly allege the parties' diversity.  [DE 123, 124]  Appellees did not object to the filing of the amended complaint for the limited purpose of identifying the diverse citizenship of all defendants.  [*Id.*]

## STATEMENT OF THE ISSUE

The issue presented is whether the District Court acted within its broad discretion in denying Appellant injunctive relief against its participation in a Financial Industry Regulatory Authority ("FINRA") arbitration requested by Appellees to recover for fraud committed by Appellant, where Appellant (1) failed to establish that it had a substantial likelihood of success in proving Appellees were not its "customers" or the customers of its "associated person" under the FINRA Code; and (2) Appellant failed to establish the remaining injunctive relief factors.

## STATEMENT OF THE CASE[1]

### *Nature of the Case*

The Investors are the victims of a massive fraud orchestrated by the developers of a series of real estate projects in Florida that were in financial distress. To bail out these projects, the developers formed a complex web of mutual funds and bond issuers that would raise capital from foreign investors through a series of financial products and then lend the capital raised back to the developers. It was all

---

[1]  This brief references Appellant Raymond James Financial Services, Inc. as "**RJFS**"; Appellees collectively as "the **Investors**"; and Amicus Curiae The Securities Industry and Financial Markets Association as "**SIFMA**." Citations to the record on appeal are to docket entry and page numbers in the District Court proceeding (*e.g.*, [DE. ## at __]). Citations to RJFS's Principal Brief are to page number (*e.g.*, "PB at ___").

53684449;4

a fraudulent scheme.  The developers owned and controlled the borrower.  They owned and controlled the lender.  And they owned and controlled the issuer.

Appellant RJFS and its affiliate Raymond James & Associates, Inc.'s ("**RJA**") (collectively, "**Raymond James**") agents Juan Carlos Cortés ("**Cortés**") and Frank Chatburn ("**Chatburn**"), were two of the main architects of this fraudulent scheme. They promoted and sold these financial products to the Investors in their capacity as Raymond James' executives and persuaded the Investors to invest in the financial products.  Raymond James was also the custodian bank for the financial products.

To seek to recover their losses due to the fraudulent scheme, the Investors brought a Financial Industry Regulatory Authority ("**FINRA**") arbitration (the "**Arbitration**") against RJA and another unrelated party Insight Securities, Inc. ("**Insight**").  The Investors moved to bring RJFS into the Arbitration as a necessary party, which the Arbitration panel granted.

This appeal arises from RJFS's attempts to avoid arbitration of the Investors' claims by seeking injunctive and declaratory relief in the District Court.  RJFS maintains that the Investors were not customers of RJFS, and therefore, RJFS is not required to participate in the Arbitration.  The District Court found to the contrary, and denied injunctive relief.

***Factual Background***

The District Court made the following factual findings in denying injunctive relief.  [*See* DE 107]

The Investors initiated the Arbitration in August 2018.  [*Id.* at 2]  In the Arbitration, the Investors claimed they were victims of a fraud orchestrated by the developers of financially-distressed real estate projects in Florida.  [*Id.*]  According to the Investors, the developers "formed a complex web of mutual funds and bond issuers that would raise capital from foreign investors through a series of financial products and then lend the capital raised back to the developers."  [*Id.*]  Further, the developers owned and controlled the borrower, lender, and issuer of the financial products.  [*Id.*]

To promote these products, the developers formed Biscayne Capital International, LLC, a U.S. registered investment advisor, and a British Virgin Islands-based broker-dealer called Biscayne Capital (BVI), Ltd. (collectively, "**Biscayne Capital**").  [*Id.*]  RJA served as a clearing firm for Biscayne Capital by performing back-office execution and administrative functions.  [*Id.*]

A.    *Chatburn Solicits the Investors and Their Investment Finder*

Chatburn, an owner and investment advisor with Biscayne Capital, was one of the developers at the helm of the fraudulent scheme.  [*Id.* at 2-6]  When Chatburn was in Ecuador in late 2007, he was introduced to Edith Hinojosa ("**Hinojosa**")—an

4

investment "finder" for Bear Stearns.  [*Id.* at 2]  Chatburn told Hinojosa that he worked with Raymond James, which he touted as a well-known American brokerage firm with lots of employees and resources.  [*Id.*]

Critically, Chatburn always referred to "Raymond James" generally and never distinguished between its subsidiary entities or divisions.  [*Id.* at 3]  Chatburn even asked Hinojosa to come work with him at Raymond James.  [*Id.* at 2-3]

B.    *Chatburn Touts his Relationship with "Raymond James"*

At Chatburn's invitation, Hinojosa flew to Florida several months later and met with Chatburn and his partners.  [*Id.* at 3]  In these meetings, Chatburn and his partners explained their real estate projects and the "viability" of the financial products that would be used to raise the capital necessary to fund those projects. [*Id.*]  Due to her interest in the proposition, Hinojosa flew to Tampa in December 2007 to meet with a Raymond James executive at the Raymond James' Tampa Office, at the behest of Biscayne Capital.  [DE 94-2 at. Exhibit B (email from Cortés to RJA executive Robb Combs stating "I really feel that what [sic] a visit to the Raymond James HQ will tip her over to come work with us on a fully committed basis. She is really enthusiastic about RJ, but we are still trying to 'reel her in,' so any help you could provide, will be greatly appreciated.")]

Hinojosa was given a tour of Raymond James' offices, where she saw a sign that read "Biscayne Capital" on the wall.  [DE 107 at 3]  On the tour, she was told

5

that Raymond James was committed to the long-term success of Biscayne Capital and that she could work with Biscayne Capital within the Raymond James platform. [*Id.*]  Specifically, her job would be to identify potential investors in Latin America for the financial products sold through Raymond James.  [*Id.* at 3-4]  As an added incentive, Raymond James would provide Hinojosa's clients with accounts.  [*Id.* at 4]

Hinojosa's eventual decision to join Biscayne Capital was based on Chatburn's representations and the "stellar reputation of Raymond James."  [*Id.*]  Chatburn told Hinojosa that "Raymond James" vetted and approved the financial products she would be promoting.  [*Id.*]; *see also* [DE 19-2 at Exhibit B (Chatburn Email stating "Raymond James owes its success precisely to the transparent manner in which we work.  We do not charge any hidden fees to the detriment of our clients.  It would be an honor to receive you in our home office in St. Petersburg so that you can get to know the human team that would manage the money of the Andes Petrolean[2] [sic.] family.")].  Hinojosa was even provided with Raymond James' branded marketing materials to solicit clients.  [DE 107 at 4]

In early 2008, Chatburn's partners traveled to Ecuador to open Raymond James accounts for Hinojosa's clients (the Investors).  [*Id.*]  Raymond James would then transfer the Investors' accounts from Bear Stearns to Raymond James.  [*Id.*]

---

[2]  "Andes Petroleum" was Investor Douglas Ray Good's employer.  [DE 92-2 at 3]

The Investors included a specific client who initially objected to the transfer, but was ultimately convinced by Chatburn, who visited the client personally and held himself out to be a "Raymond James" employee. [*Id.*] The Investors each signed custodian agreements with RJA. [*Id.*] Notably, the letterhead for the custodian agreements read "Raymond James." [*Id.*] Hinojosa began to successfully promote Biscayne Capital's financial products, which she marketed as being "part of the Raymond James portfolio of products." [*Id.*]

### C. Chatburn Represents Himself to be a "Raymond James" Advisor

The District Court found multiple facts to be undisputed. First, Chatburn was a registered broker with RJFS from March 2008 through August 2008. [*Id.*] Moreover, on February 28, 2008, Chatburn signed a RJFS Independent Associate Agreement, which states Chatburn's title as "Branch Manager or Representative in Charge" of the RJFS Miami Office. [*Id.* at 4-5; DE 63] As the District Court determined, "this aligns with [the Investors'] understanding that Chatburn was Raymond James' Branch Manager between 2008 and 2012." [DE 107 at 5] Chatburn even distributed business cards stating as such inside Raymond James-branded folders. [*Id.*]

Between 2008 and 2015, Chatburn "progressively" visited Ecuador to meet with the Investors. [*Id.*] Chatburn successfully courted the Investors during these trips, always touting the "imprimatur of Raymond James." [*Id.*] For example,

Investor Douglas Ray Good ("**Good**") confirmed that Chatburn solicited him to invest in multiple Raymond James products, both individually and in his capacity as a member of the Andes Petroleum savings plan committee.  [*Id.*]  Chatburn advised Good that Chatburn could order trades for Good and place the trades directly through Good's RJA account.  [*Id.*]  The District Court noted that "Chatburn even went so far as to provide Good with a proprietary Raymond James Equity Research Report." [*Id.*]  The District Court noted "all the record evidence indicates that Chatburn always referred to 'Raymond James' in the global sense and never distinguished between the Raymond James entities."  [*Id.*]

Even though Chatburn continued to hold himself out as a Raymond James advisor for years, he was terminated on August 15, 2008.  [*Id.*]  Critically, neither Chatburn nor anyone from Raymond James, RJFS, or RJA ever notified the Investors that Chatburn—who was still holding himself out to be a Raymond James advisor, had left RJFS.  [*Id.*]  Chatburn continued, on numerous occasions in 2008 and 2009, to hold himself out to Good and the Andes Petroleum savings plan committee as being associated with "Raymond James".  [*Id.* at 5-6]  Good and his wife continued to invest through their RJA accounts, trusting Chatburn.  [*Id.* at 6] Chatburn and Biscayne Capital ran into legal trouble (civil and criminal) around 2016.  [*Id.*]

8

Specifically, on October 11, 2019, Chatburn pled guilty to conspiracy to commit money laundering. [DE 19 at Exhibit 3] In his factual proffer in support of his guilty plea, Chatburn confirmed that the financial products he marketed to the Investors were in fact fraudulent. [*Id.* at 5-7]

### D. The Meaning of "Raymond James"

One of the central issues in this case is the meaning of "Raymond James." It is RJFS's position that RJFS and RJA are wholly separate entities under the same parent company, Raymond James Financial, Inc. [*Id.*] RJFS's corporate representative testified that RJA and RJFS share a campus, share resources when possible, and ultimately report to the same General Counsel for compliance matters. [*Id.*] The testimony showed that RJA and RJFS share a database of client records and information that allows employees of both entities to search the parent company's records. [*Id.*] In addition, Chatburn's agreement with RJFS makes clear that RJFS contracts on behalf of itself and RJA, and that Chatburn was authorized to sell RJA products, a process termed "selling away." [*Id.*]

### FINRA Arbitration

To seek to recover their losses due to the fraudulent scheme, the Investors brought the Arbitration against RJA and another unrelated party Insight Securities, Inc. ("**Insight**") pursuant to the account opening documents with RJA. [*Id.*] After various discovery disputes and meet and confer communications, it became clear to

9

the Investors that RJFS needed to be brought into the Arbitration as a necessary party.

The Investors moved to add RJFS as a party respondent to the Arbitration, which RJA opposed. [*Id.*; DE 19 at 9]  After a full hearing on the motion, the Arbitration panel granted it.  Although the Investors do not have an arbitration agreement with RJFS, the Arbitration panel found that RJFS was a proper party to the Arbitration under the FINRA Code of Arbitration Procedure (the "**FINRA Code**").  [DE 107 at 6-7]

In the Arbitration, the Investors allege that both RJFS and RJA are liable for "aiding and abetting in the fraud perpetrated by the Biscayne Individuals [(including Chatburn and others)], and the entities they controlled, gross negligence, negligence, breach of fiduciary duty, and for failure to supervise its agents." [*Id.* at 7]

***District Court Litigation***

Discontent with the Arbitration panel's order, RJFS did not appear in the Arbitration, and instead brought this federal action in December 2019 seeking to enjoin its participation in the Arbitration.  [DE 1]  RJFS filed its Complaint against the Investors alleging one count for declaratory judgment and another count for injunctive relief.  [*Id.*]  Count I sought a declaration that the Investors' claims against RJFS are not arbitrable under Rule 12200 of the FINRA Code.  [*Id.* at 17-18]  Specifically, RJFS sought a declaration that the Investors "are not and never were

10

'customers' of RJFS within the meaning of FINRA Rule 12200 or otherwise."[3]  [*Id.* at 17]

In Count II, RJFS asked the Court to enjoin the Investors from proceeding with the Arbitration against RJFS.  [*Id.* at 18-19]  However, the District Court dismissed that count for failure to state a claim for relief because "[i]njunctive relief is a remedy, not a separate cause of action."  [DE 107 at 7]

Simultaneously with filing its Complaint, RJFS filed a Motion for Preliminary and Permanent Injunction and Incorporated Memorandum of Law and a Motion for Temporary Restraining Order and Incorporated Memorandum of Law (the "**Injunction Motion**").  [DE 3]  In sum, RJFS claims that the Investors were not customers of RJFS under Rule 12200 and therefore, did not have an agreement with the Investors and thus, should not be hailed into Arbitration.  [*See id.*]

The District Court held a hearing on the Motion [DE 9] and entered an order granting RJFS a temporary restraining order (the "**TRO**") [DE 14].  Per the TRO, the District Court "restrained, directly or indirectly, [the Investors] from prosecuting their claims against RJFS in the Arbitration."  [*Id.* at 7]  The District Court ordered that the TRO would "remain in full force and effect until such time as the Court

---

[3]  FINRA Rule 12200 "requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand."  *Pictet Overseas, Inc. v. Helvetia Trust*, 905 F.3d 1183, 1187 (11th Cir. 2018).

holds an evidentiary hearing on the Motion for Preliminary Injunction and rules on the same." [*Id.* (emphasis removed)]

The Investors filed an Emergency Motion to Vacate Temporary Restraining Order; Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction; Opposition to Plaintiff's Motion for Preliminary and Permanent Injunction; & Request for Emergency Hearing. [DE 19]  After a brief status hearing with the District Court, this motion was converted to an "expedited" motion and was fully briefed by the parties. [DE 23, 25, 31]  All the while, the District Court maintained and extended the TRO. [DE 88 at 2]

Later, both sides submitted additional memoranda and evidence regarding the question of the relationship between RJFS and the Investors. [DE 92, 93]

The District Court heard extensive arguments from the parties on the issue of the TRO and the Injunction Motion. [DE 107 at 8]  Ultimately, the District Court concluded that the Investors were indeed customers of RJFS and RJFS is therefore subject to the Arbitration. [*Id.* at 10]  The District Court vacated the TRO and denied the Injunction Motion, entering a thorough memorandum opinion in support of its order (the "**Order**"). [DE 107]

The Order found that "RJFS failed to show that it has a substantial likelihood of proving that [the Investors] are not 'customers' of Chatburn for purposes of Rule 12200." [*Id.* at 10]  The Order went on to find that "RJFS failed to show it has a

12

substantial likelihood of proving that Chatburn was not an 'associated person' of RJFS for purposes of Rule 12200." [*Id.* at 12]  The Order did not reach the remaining injunctive relief elements because RJFS did not establish a substantial likelihood of success in proving that Rule 12200 bars RJFS's participation in the Arbitration.  [*See id.*]

### *This Appeal*

This appeal of the Order followed.  The Investors filed a motion to dismiss this appeal (the "**Motion to Dismiss**").  The Investors explained in the Motion to Dismiss that RJFS asks this Court in this appeal to reverse the District Court's denial of a preliminary injunction that would prohibit an arbitration panel from exercising jurisdiction over RFJS.  [Mot. at 1]  However, as the Investors point out, pursuant to clear statutory authority and this Court's binding precedent, orders refusing to enjoin a party's participation in arbitration are not appealable.  Moreover, the Investors established in the Motion to Dismiss that dismissal of this appeal is required because this appeal is moot.  After RJFS initiated this appeal, RFJS consented to the Arbitration panel's jurisdiction and agreed to be bound by the Arbitration panel's decision.  In light of that consent, the Investors maintain that this appeal no longer presents a live controversy in which this Court can provide any meaningful relief.  Like the non-appealability of the Order, the mootness of this appeal also deprives this Court of subject matter jurisdiction and mandates dismissal.

RJFS objected to dismissal of this appeal. This Court issued an order on October 5, 2020, carrying the Motion to Dismiss with the case. The Investors maintain dismissal of this appeal is still warranted for the reasons stated in the Motion to Dismiss, and do not waive those arguments by filing this brief. In fact, the Arbitration has already commenced and RJFS and RJA have been actively presenting their defense in the Arbitration; seven days of Arbitration hearings have already occurred, and additional Arbitration hearings are scheduled for January, February, March, May, June, October, and November of next year. Moreover, RJFS has actively participated in all prior Arbitration proceedings and has never moved in the Arbitration to stay the Arbitration pending the resolution of this appeal.

### Standard Of Review

This Court "review[s] the district court's ultimate decision to deny plaintiff's motion for abuse of discretion, but [examines] any constituent legal conclusions *de novo*." *Callahan v. U.S. Dep't of Health & Human Servs.*, 939 F.3d 1251, 1257 n. 8 (11th Cir. 2019) (citing *U.S. v. Endotec, Inc.*, 563 F.3d 1187, 1194 (11th Cir. 2009)). This Court reviews "the findings of fact of the district court for clear error." *Forsyth Cty. v. U.S. Army Corps of Engineers*, 633 F.3d 1032, 1039 (11th Cir. 2011) (citation omitted).

14

## SUMMARY OF THE ARGUMENT

Although RFJS raises six purportedly-independent arguments on appeal, the appeal raises a narrow issue of whether RJFS set forth sufficient evidence to meet its burden to obtain injunctive relief sufficient to avoid the Arbitration.  It did not.  Moreover, as explained in Appellees' motion to dismiss that has been carried with the case, this Court lacks jurisdiction to consider RJFS's arguments in any event.  This Court's precedent dictates that orders refusing to enjoin a party's participation in arbitration—which precisely describes the order on appeal—are not appealable.  Even if it is, this appeal was rendered moot when RJFS consented to the Arbitration panel's jurisdiction and agreed to be bound by the Arbitration panel's decision.

To the extent this Court considers RJFS's arguments on the merits—which it need not do as explained in Appellees' motion to dismiss, they clearly fail.  The District Court acted within its broad discretion in denying RJFS injunctive relief against its participation in the Arbitration.  FINRA Rule 12200 requires arbitration of disputes between "a customer and a member or associated person of a member" that "arise[] in connection with the business activities of the member or the associated person."  RJFS failed to establish that it had a substantial likelihood of success in proving that the Investors were not "customers" of RJFS or Chatburn, or that Chatburn was not an "associated person" of RJFS for purposes of FINRA Rule 12200.

The undisputed evidence overwhelmingly establishes that Chatburn directly, and through statements made to the Investors' investment finder Hinojosa, induced the Investors to open investment accounts with RJFS's affiliate, RJA. The undisputed evidence also shows that independent contractor financial advisors of RJFS, like Chatburn, sell investment accounts with RJA. Indeed, the form Independent Sales Associate Agreement confirms that RJA acted as an alter ego with respect to the independent financial advisors of RJFS. In other words, accounts with RJA solicited by Chatburn are deemed "customers" of Chatburn in connection with his business relationship with RJFS. The evidence shows that RJFS and RJA acted in concert selling their financial products and services, and that the independent contractors of RJFS are expected to solicit and promote RJA investment accounts.

The length of time Chatburn was an associated person of RJFS is irrelevant. Under the FINRA Rules, as long as the terminated associated person continues performing the business activities of the member, as Chatburn did here, he is deemed to continue to be an associated person of the FINRA member (RJFS) and the customers solicited within the scope of that relationship are the customers of the FINRA member (RJFS).

Moreover, RJFS failed to establish the remaining injunctive relief factors. This case is not suited for injunctive relief. On this record, an injunction would forever deprive the Investors of their right to arbitrate their claims against the two

16

Raymond James entities that together induced them to open the investment accounts and purchase the fraudulent products.  Even if the District Court ultimately concludes on a full record that the Investors were in fact customers of RJFS, that harm to the Investors is irreparable.

In contrast, there is no irreparable harm to RJFS.  It would still have the opportunity to move to vacate any adverse award for lack of arbitrability in the unlikely event it can disassociate itself from RJA and Chatburn.

Further, the public interest is best served by requiring RJFS to participate in the Arbitration.  There is a strong federal policy in favor of the arbitration of disputes where the parties agreed that, as they did here, those disputes would be subject to arbitration.

This Court should affirm the Order in all respects and require RJFS to join the Arbitration.

## ARGUMENT[4]

## I.     THE DISTRICT COURT ACTED WELL WITHIN ITS BROAD DISCRETION IN CONCLUDING THAT RJFS DID NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF RJFS'S ARGUMENT THAT DEFENDANTS' CLAIMS ARE NOT ARBITRABLE UNDER RULE 12200 OF THE FINRA CODE.

### A.     *Legal Standard.*

---

[4]  For ease of this Court's understanding, Issue Statements I through V in RJFS's Principal Brief are consolidated in this Answer Brief into one restated issue with subparts.

To obtain a preliminary injunction, a party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (per curiam) (citation omitted). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301,1303 (11th Cir. 1998).

Courts must interpret the FINRA Code "as it would a contract under the applicable state law." *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (citing *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). This Court has recognized that "[t]he FINRA Arbitration Code is unambiguous" and therefore, "the parties' intent must be gleaned from the four corners of the document." *Pictet*, 905 F.3d at 1188 (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011) (internal quotations omitted)). "[T]he language of the Code itself is the best evidence of the parties' intent, and its plain meaning controls." *Id*. (internal quotation marks omitted).

18

"[U]nlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *King*, 386 F.3d at 1367 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24-25 (1983) (internal quotations omitted)). Moreover, the FINRA Code constitutes a written agreement to arbitrate. *See, e.g.*, *Deutsche Bank Sec. Ins. v. Simon*, No. 19-20053-CIV, 2019 WL 4864465, at *3 (S.D. Fla. Sept. 26, 2019), *report and recommendation adopted*, No. 19-20053-CIV, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) (internal citations omitted).

In other words, where no written agreement to arbitrate exists between the parties, Rule 12200 governs when "[p]arties must arbitrate a dispute under the Code." *Simon*, 2019 WL 4864465, at *3 (citing FINRA Rule 12200). They must do so if three requirements are met: (1) a customer requests arbitration; (2) "[t]he dispute is between a customer and a member or associated person of a member"; and (3) "[t]he dispute arises in connection with the business activities of the member or associated person . . . ." *Id*.

Because the third factor is largely undisputed[5], determining whether RJFS met the substantial likelihood of success factor hinges only on whether the Investors were

---

[5] *See Deutsche Bank Sec., Inc. v. Ades*, No. 18-25142-CIV, 2019 WL 1077905, at *3 (S.D. Fla. Mar. 7, 2019) (citing *Bornstein*, 390 F.3d at 1344-45; *King*, 386 F.3d at 1370) ("The Eleventh Circuit has made clear that a customer's claim that a FINRA member failed to supervise its associated person in connection with the dispute satisfies the second requirement of a connection between the customer and the

19

"customer[s]" of Chatburn and whether Chatburn was an "associated person" of RJFS for purposes of Rule 12200. RJFS's failure to establish that it had a substantial likelihood of success on either of those questions means only one thing—it cannot avoid the Arbitration through a preliminary injunction.[6]

**B.     The District Court did not abuse its broad discretion in determining RJFS failed to show it had a substantial likelihood of success on its claim that the Investors were not "customers" of RJFS and Chatburn for purposes of Rule 12200.**

Rule 12200 does not define "customer" or provide guidance as to what defines a "customer". Instead, it says only that a "customer shall not include a broker or dealer." *Sagepoint Fin., Inc. v. Small*, No. 15-CV-0571 DLI RML, 2015 WL 2354330, at *4 (E.D.N.Y. May 15, 2015). Other circuit courts of appeal have interpreted the term "customer" within the context of Rule 12200. The Second Circuit has recognized that a "customer" for purposes of Rule 12200 is a non-broker or non-dealer who either "(1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Citigroup Global Markets, Inc. v.*

_____

member's conduct."). RJFS appears to maintain in its Principal Brief that this appeal concerns in part "whether [the Investors'] dispute arose in connection with the business activities of RJFS or Chatburn." [PB at 23] However, RJFS agreed this element was undisputed at the hearing on the Injunction Motion. [DE 107 at 9]

[6] Appellees incorporate by reference their July 24, 2020 Motion to Dismiss Appeal that has been carried with the case via order dated October 5, 2020. While Appellees explain in this brief why each of RJFS's appellate arguments fail on the merits, this Court lacks jurisdiction to consider them for all of the reasons specified in the motion to dismiss.

*Abbar*, 761 F.3d 268, 275 (2d Cir. 2014).  The Ninth and Fourth Circuits define "customer" as "a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014); *see also Morgan Keegan & Co., Inc., v. Silverman*, 706 F.3d 562, 566 (4th Cir. 2013) (same).

In this case, the undisputed facts more than satisfy the definitions of "customer" recognized by the Second, Fourth, and Ninth Circuits.  As a FINRA member, RJFS consented to arbitration in accordance with the FINRA Code of Arbitration Procedure for Customer Disputes.  *See MONY*, 390 F.3d at 1342; *Metro. Life Ins. Co. v. Puzzo*, 2014 WL 1817636, at *2 (N.D. Ga. May 6, 2014).  Moreover, the District Court found the following to be undisputed:

- "Chatburn solicited [the Investors] to sign custodial agreements with RJA while he was a registered financial advisor for RJFS.";

- Investor "Edwin Alberto Torres Mino, as well as Good, confirmed that Chatburn directly solicited and promoted Raymond James products and services to them.";

- "Both [Mino and Good] had various communications with Chatburn, during which time Chatburn held himself out to be a representative of 'Raymond James' in the global sense.";

21

- "In fact, on numerous occasions in 2008 and 2009—after Chatburn was allegedly no longer a registered broker with RJFS—Chatburn continued to hold himself out to Good and the Andes Petroleum savings plan committee as being associated with 'Raymond James.'"

- "Through it all, Good continued to purchase through his RJA account."

[DE 107 at 10-11]

Moreover, as the District Court explained, "[c]ourts have found that a 'selling away' relationship where the associated person of a FINRA member sells the financial products of an affiliated company to an investor is sufficient to establish a customer relationship." [*Id.* at 11 (citing *Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481, at *5 (S.D. Fla. Feb. 28, 2020)); *King*, 386 F.3d at 1370; *Bornstein*, 390 F.3d at 1344] Thus, the Investors were "customers" of RJFS and Chatburn for Rule 12200 purposes.

RJFS acknowledges the definition of "customer" as set forth by the Second, Fourth, and Ninth Circuits, but maintains that the undisputed facts here do not satisfy that definition because the Investors had no written customer agreement with RJFS and "no transaction occurred" between the Investors and RJFS. [PB at 45-49] Basically, RJFS asks the Court to ignore the Code's plain language and adopt a narrow definition of "customer" to include only one who has a *direct* relationship with a FINRA member either through (1) a written customer agreement; or (2) a

22

direct purchase from that FINRA member.  But nothing in the Code or the case law that interprets it supports this narrow definition.  Rather, "all that matters is the relationship between the investor and the advisor, and the advisor's status as an associated person."  *Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 398 (E.D.N.Y. 2014).

This Court's precedent shows that the absence of a direct, written agreement is not fatal to the Investors' claim that they satisfy the definition of "customer".  In *Pictet*, this Court explained that when a member joins FINRA, it agrees to comply with FINRA's rules like all other members.  905 F.3d at 1187.  FINRA's rules include Rule 12200, which by its plain language requires a FINRA member ***and its associated persons*** to arbitrate disputes with customers before FINRA when a customer demands arbitration.  *Id.*; *see also King*, 386 F.3d at 1367 ("Although there is no direct written agreement to arbitrate between IFG and King, the Code serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third party claimants.") (citation omitted).  To hold otherwise, would impermissibly render the phrase "and its associated persons" meaningless. *See Rolyn Cos., Inc. v. R & J Sales of Tex., Inc.*, 412 F. App'x 252, 255 (11th Cir. 2011) (declining to construe a contract in such a way that would render certain terms meaningless); *see also Pictet*, 905 F.3d at 1188 (FINRA rules are interpreted in the same manner as contracts); *Gray v. New York Life Ins. Co.*, 879 F. Supp. 99, 102

23

(N.D. Ala. 1995) (declining to adopt reasoning that "would render totally meaningless" a provision of the Code of Federal Regulations).

RJFS's argument that the Investors were not "customers" of RJFS because they lacked a direct customer relationship similarly fails. The clear and unambiguous language of the Code confirms the definition of "customer" is broad. This Court reaffirmed the broadness of this definition in *King*. There, this Court found that King was a "customer as long as she is not a broker or dealer; nothing in the Code directs otherwise or requires more." *King*, 386 F.3d at 1364. In fact, this Court rejected the plaintiff's narrow interpretation in *King* of the definition of "customer" because it would impose "a limitation into the Code that is absent from its language." *Id*.

*Viyella* is instructive. There, the Southern District of Florida explained that there is no need to analyze extrinsic evidence in the face of the unambiguous language of the Code and the relevant Eleventh Circuit case law. 2020 WL 977481, at *7. The *Viyella* court analyzed *King* and recognized that "[t]he court found King was a customer for purposes of arbitration because she was a customer of IFG's associated person, *even though she did not have a direct transactional relationship with IFG*." *Id*. (emphasis added) (citing *King*, 368 F.3d at 1368-70; *see also Bornstein*, 390 F.3d at 1344 (relying on *King* and concluding that the claimants were

customers of the member because they were customers of the member's registered representative).[7]

**C.    The District Court did not abuse its broad discretion in determining RJFS failed to show it had a substantial likelihood of success on its claim that Chatburn was not an "associated person" of RJFS for purposes of Rule 12200.**

Critically, RJFS essentially admitted below that Chatburn was its "associated person".  [DE 25 at 15 (acknowledging in opposition to emergency motion to vacate TRO that Chatburn "was registered with RJFS" for five months); DE 31 at 2 (Appellees arguing "[i]n its Opposition, RJFS admits that Chatburn was its Associated Person")]  RJFS was, and is, unable to deny that Chatburn directly, and through statements made to the Investors' investment finder Hinojosa (which were intended to be communicated to the Investors), induced the Investors to open investment accounts with RJFS's affiliate, RJA.  In light of this admission, RJFS cannot raise contrary arguments on appeal.  *See Tucker v. Mukamal,* 616 F. App'x 969, 973 (11th Cir. 2015) ("[E]ven if [appellant] had standing to challenge the bankruptcy court's order … we note he conceded before the bankruptcy court that the Trustee had 'absolute statutory authority' to close the case …. He therefore has

---

[7]  Notably, the appeal of the Southern District's order—which had denied a motion for a preliminary injunction against proceeding in the FINRA arbitration—was dismissed for lack of jurisdiction based on the same deficiencies Appellees outlined in their motion to dismiss this appeal.  *See Viyella v. Fundacion Nicor*, No. 20-11224-BB, 2020 WL 5755844, at *1 (11th Cir. July 14, 2020).

waived any argument to the contrary."); *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1202 n.34 (11th Cir. 2010) (finding two entities were "general partners" of third entity and subject to liability, in part, because they "conceded below that their liability could stem from general partnership law").

This argument also fails on the merits. The undisputed facts in this case firmly establish the following: (1) Chatburn was a FINRA registered broker for RJFS and the manager of its Miami office [DE 107 at 4-5, 14]; (2) Chatburn induced the Investors and their investment finder Hinojosa to invest in the fraudulent financial products at issue in the Arbitration and open investment accounts with RJA [DE 107 at 13]; and (3) the Investors opened accounts and funded investments with RJA [*Id.*].

Moreover, the evidence overwhelmingly establishes that independent contractor financial advisors of RJFS sell investment accounts with RJA, as Hinojosa confirmed in her declaration. [DE 19-2 at 10] Moreover, the public filings of Raymond James Financial, Inc. with the Securities and Exchange Commission on behalf of its wholly owned subsidiaries RJFS and RJA explicitly state that: (1) RJFS is one of the largest independent contractor brokerage firms in the U.S.; and (2) financial advisors affiliated with RJFS may offer their clients all products and services offered by RJA. [DE 31-1 at 4]

Further, the Independent Associate Agreement involving RJFS confirms that RJA acted as an alter ego with respect to the independent financial advisors of RJFS.

26

[DE 63]   Specifically, the agreement explicitly defines the contracting party—RJFS—to include all the Raymond James affiliated companies.  [*Id.* at Exhibit A at 2]

The agreement also defines clients of the independent contractor financial advisor as any client of the financial advisor that "have any account with RJFS."  [*Id.* at Exhibit A at 1]   In other words, accounts with RJA solicited by Chatburn are deemed to be clients of Chatburn in connection with his business relationship with RJFS.   Under *King* and *Pictet*, this alter ego relationship makes the Investors customers of RJFS.[8]  *See also Waterford Inv. Serv. v. Bosco*, 682 F.3d 348 (4th Cir. 2012).

RJFS maintained below that "RJFS is an entity that supports independent contractor financial advisors—and has nothing to do with clearing and custodial functions contracted for with RJA."  [DE 25 at 9]  That statement is incorrect.  It is clear that RJFS and RJA act in concert selling their financial products and services,

---

[8]   This is among the many reasons that this Court should afford no weight to the arguments raised by SIFMA in the Amicus Brief.  The district court's ruling does not create any "unpredictable standard" for determining when FINRA arbitration may be compelled [Amicus Brief at 3]—it simply recognizes the ample evidence submitted in this case demonstrating the arbitrability of the claims at issue, as well as RJFS's failure to carry its burden of proving entitlement to injunctive relief.  The rules' plain language and pertinent case law mandates such a result in this case, just as they would in any similar case.

27

and that the independent contractors of RJFS are expected to solicit and promote RJA investment accounts.

Under *King* and *Bornstein*, these undisputed facts and the myriad of others set forth below are more than sufficient to establish that Chatburn was an "associated person" of RJA for Rule 12200 purposes. In fact, both *King* and *MONY* involve facts that are almost identical to the undisputed facts at issue here.

*King* makes clear that a FINRA member cannot escape mandatory arbitration with an investor that was induced by an "associated person" of the FINRA member to open an account and enter into an arbitration agreement with an affiliated company of the FINRA member. 386 F.3d at 1370. "In *King*, an investor entered into an investment upon the advice of Mr. Micciche, an associated person of IFG." *Deutsche Bank Sec., Inc. v. Simon*, 2019 WL 4685876, at *2 (S.D. Fla. Sept. 26, 2019) (citing *King*, 386 F.3d at 1365). IFG was a FINRA member.

In *King*, it was undisputed that, like here, the investor did not have an account or written contract with IFG and IFG did not receive or distribute funds for the transaction. *Id.* at 1366. The investment failed, and the investor initiated a FINRA arbitration proceeding against IFG bringing several claims, including that IFG failed to supervise Mr. Micciche. *Id.* IFG then filed an action in federal court seeking a declaration that it had no obligation to arbitrate. *Id.*

In affirming the district court's order compelling arbitration, this Court held that: (1) the investor, although not a direct customer of IFG, qualified as a "customer" under the FINRA rules; (2) the dispute arose in connection with the business of a member, because "[w]hen an investor deals with a member's agent or representative, the investor deals with the member," *id.* at 1370; and (3) the investor's negligent supervision claim satisfied the requirement that the dispute involve the business of IFG." *Simon*, 2019 WL 4685876, at *2; *see also Bornstein,* 390 F.3d at 1344; *Deutsche Bank Sec., Inc. v. Ades*, 2019 WL 1077905, *2 (S.D. Fla. March 7, 2019); *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.*, 65 F.Supp.2d 1371, 1381-82 (S.D. Fla. 1999).  In sum, as in *King* and *Bornstein*, here, the Investors were customers of Chatburn, a registered representative of RJFS; the Investors allege that RJFS was negligent, and Chatburn induced the Investors to open accounts with an affiliate of RJFS—RJA.

The conclusion that the Investors are the customers of an "associated person" of RJFS is compelled by the more recent decision of this Court in *Pictet*.  905 F.3d at 1190.  There, this Court made clear that the clients solicited by the associated person of a FINRA member are the customers of that FINRA member for purposes of Rule 12200 if the solicitation arises in connection with the business activities of the FINRA member's associated person.  That is the case here.  RJFS cannot seriously dispute that Chatburn's solicitation and promotion of RJA's investment

29

accounts were in connection with his relationship with RJFS. The SEC filings and the Independent Associate Agreement confirm this.

Indeed, there is yet another link between RJA and RJFS—the fact that there is an interest and commonality of ownership between RJFS and RJA, and these two entities shared human resources (*i.e.* Chatburn) in the procurement of the investors. *See Waterford*, 682 F.3d at 356. RJFS and RJA are wholly owned subsidiaries of Raymond James Financial, Inc. Therefore, the undisputed facts show that both RJFS and RJA acted in concert to recruit the Investors to open accounts at RJA and that the Investors are "customers" of both entities.

RJFS complains that the district court "entirely conflate[d] two distinct corporate entitites—RJA and RJFS." [PB at 19] However, the evidence is overwhelming that these two entities acted like one.

RJFS also argued below that the nature of the relationship between Chatburn and the Investors "is very much in dispute." [DE 25 at 15] To try to support this argument, RJFS pointed to the fact that a number of other branch managers participated in the transactions with the Investors. However, that argument ignores the unrebutted testimony of Hinojosa, who stated under oath that Chatburn told Hinojosa that the financial products that are at issue in this case were vetted, approved, and carried by "Raymond James." [DE 19-2 at 8] She understood this to mean that all the Raymond James entities were involved with the securities,

30

including RJFS, the entity that appeared on Chatburn's business card and broker registration.  [*Id.*]

These statements were made directly to Hinojosa and/or her clients (*i.e.*, the Investors) orally and in writing.  [*Id.*]  For example, in an email in which she was copied and was sent to various individuals including Investor Good, Chatburn said:

> … Please review the information in the link below (audited annual report of Raymond James).  The year 2008 was an extraordinary one for our institution.
>
> http://www.raymondjames.com/annualreport/index.htm?rfrl=rjnet
>
> Raymond James owes its success precisely to the transparent manner in which we work.  We do not charge any hidden fees to the detriment of our clients.  It would be an honor to receive you in our home office in St. Petersburg so that you can get to know the human team that would manage the money of the Andes Petrolean family.
>
> I remain yours, cordially
>
> Frank Chatburn
>
> Biscayne Capital
> Director & Vice President
> T: 305.728.5260
> F: 305.728.5288
> C: 305.778.6112
> E: Frank.chatburn@biscaynecapital.net
> www.raymondjames.com

[*Id.* at 8-9]

Hinojosa further testified that: "After Chatburn's early 2008 trip, Chatburn visited Quito every month until 2015 to meet with Hinojosa's clients."  [*Id.* at 10]

Chatburn succeeded in selling her clients more products as during those visits he would emphasize the success of Sentinel and the South Bay Financial Products and would compare those products to other products in the open market. [*Id.*] "Chatburn would speak of the markets in general, of the strength of Raymond James and Sentinel, the lack of volatility, and the luxurious nature of the Sentinel and South Bay Financial Products." [*Id*. at 10-11] Specifically, Chatburn and Hinojosa visited many of the Investors together. [*Id*. at 11] Hinojosa also traveled every 3-4 months to Miami, and visited Raymond James' offices in Tampa several times. [*Id.*] This testimony is undisputed.

In addition, in his factual proffer in support of his guilty plea in his criminal case, Chatburn confirmed that he was in fact promoting the financial products carried by RJA. *See* [DE 19-3 at 4-6]. And the SEC Order further confirms the fact that Chatburn was selling financial products that were custodied at RJA. [DE 31-4]

RJFS complains that the Investors never had an account with RJFS [PB at 5, 11], but it ignores that the Investors opened accounts with its affiliate RJA based on the recommendation of its associated person, who was acting within the scope of his duties. Contrary to RJFS' arguments, the case law is sound on this: never having an account directly with a member does not foreclose a claimant from qualifying as a "customer" under the FINRA rules. *See King*, 386 F.3d at 1366; *Pictet*, 905 F.3d at 1188-89; *see also Bornstein*, 390 F.3d at 1344 (investors were "customers" of

MONY under NASD arbitration rules[9] by virtue of being customers of the affiliated broker; the claim against MONY was arbitrable solely based on the relationship between the MONY-affiliated investment advisor and the investors); *Lehman Bros., Inc. v. Certified Reporting Co.*, 939 F. Supp. 1333, 1340 (N.D. Ill. 1996) (claimant was a customer of a broker based on the purchase of stocks in reliance on advice from that broker, even when the actual purchase of stocks was accomplished through other brokerage firms).

Finally, RJFS maintains that Chatburn qualifies as its "associated person" only during the particular period of time Chatburn was a registered financial advisor for RJFS (March 18, 2008 through August 15, 2008). [PB at 24-31] The facts belie this argument because they show that Chatburn continued to work for RJFS throughout the relevant time period in this case.

RJFS relies for this proposition primarily on *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814 (11th Cir. 1993), which held that a broker-dealer was not obligated to arbitrate any claims arising from trading conducted through its predecessor-in-interest.[10] However, RJFS again misapplies *Wheat*.

---

[9] "NASD" refers to the National Association of Securities Dealers, which was the "predecessor of FINRA." *Goldman, Sachs & Co. v. City of Reno*, 747 F. 3d 733, 749 n.3 (9th Cir. 2014).

[10] *Wheat* was abrogated on other grounds by this Court in *Larsen v. Citibank, FSB*, 871 F.3d 1295, 1303 n.1 (11th Cir. 2017).

*Wheat* does not stand for the proposition that there is a temporal bar that requires a transaction to take place *during* the broker's registration period for the broker to be considered an "associated person."  Rather, "*Wheat* discussed timing for investors who were harmed by the firm's successor in interest.  In contrast, in both *King* and here, the investor was a customer at the time the events took place." *Bornstein*, 390 F.3d at 1345 (citing *King*, 386 F.3d at 1370).

As in *King* and *Bornstein*, and as explained above, the Investors were customers at the time the events took place—namely, when Chatburn solicited them to open accounts with the allure of financial products backed by Raymond James. Although not all the transactions were executed during the few months that Chatburn was registered with RJFS, many were executed while Chatburn had not yet ceased his affiliation with Raymond James.  In addition, much of the investment activity occurred while he was holding himself out to be a Raymond James-affiliated person.

Importantly, the FINRA Rules make clear that a FINRA member cannot, on one hand, benefit from the continued business activities of a terminated associated person and, on the other, claim that any post-termination customer of the former associated person is not its customer for purposes of FINRA Rule 12000.  Thus, the relevant question here is whether a person formerly associated with a FINRA member can still be deemed an "associated person" for purposes of triggering arbitration under Rule 12200.  Case law answers this question in the affirmative, and

the plain language of the FINRA Code, once again, favors the Investors' interpretation. Notably, FINRA Rule 12100(u) specifically defines "associated member" as "*a person formerly associated with a member.*" FINRA, RULE 12100(u) (emphasis added); *see also Metlife Sec., Inc. v. Pizzano*, No. 09-CV-4459 (DMC-MF), 2010 WL 2545170, at *4 (D.N.J. June 18, 2010) ("Undeniably, Lucchetto, a former registered agent of Plaintiff, terminated two months prior to the alleged misconduct, is a person formerly associated with a member and, therefore, for purposes of the Code, Lucchetto qualifies as a person associated with a member.").

Therefore, the customers of Chatburn are the customers of RJFS as long as Chatburn's activities were in connection with RJFS. That is particularly applicable in a case in which RJFS did not provide any termination notice with respect to its agreement with Chatburn. [DE 107 at 5 ("Importantly, neither Chatburn or anyone from Raymond James (or RJFS or RJA) ever notified Defendants that Chatburn, who was still holding himself out to be a Raymond James advisor, had left RJFS.")]

Reading Rule 12100(u) as RFJS urges this Court to do [PB at 41-45] would impermissibly require eliminating the entire last sentence of the rule to absolve RJFS of all liability for the fraud perpetrated against the Investors. Again, it is *undisputed* that Chatburn was formerly associated with RJFS and initiated his solicitation of the Investors while affiliated with RJFS. Because "formerly associated" means

35

"associated" under the FINRA Code, Chatburn is an "associated person" with RJFS for purposes of the Investors' claims.

Another separate and independent basis under Rule 12100(u)(2) supports the conclusion that Chatburn is an "associated person" of RJFS for purposes of Rule 12200.  Rule 12100(u)(2) includes "branch manager of a member" in the definition of "person associated with a member".  FINRA  Rule 12100(u)(2).  It is *undisputed* that Chatburn held himself out to be Raymond James' Miami Branch Manager for years.  [DE 107 at 4-5]  The business cards he distributed referred to him as Branch Manager of RJFS.  [*Id.*]  As the District Court found, "although not all the transactions were executed during the few months that Chatburn was registered with RJFS, many were executed while Chatburn had not yet ceased his affiliation with Raymond James and continued to hold himself out as such."  [*Id.* at 13]

### D.    *At a minimum, courts should defer to the Arbitration panel's interpretation of its own rules.*

The District Court's decision is consistent with the Arbitration panel's decision to order RJFS to participate in the Arbitration, which is entitled to deference.  Under FINRA Rule 13413, the arbitration panel "has the authority to interpret and determine the applicability of all provisions" under the Code.  *See also Citadel Servicing Corp. v. Castle Placement, LLC*, 2019 WL 6909538, at *10 (S.D.N.Y. Dec. 19, 2019) ("[T]he FINRA Rules empower an arbitrator to decide issues of arbitrability.") (internal citations omitted).

Deferring to the decision of the FINRA arbitration panel is particularly appropriate here where RJFS chose to argue in front of the FINRA arbitration panel through its proxy or agent RJA. Indeed, RJA's own filings in the arbitration reveal that with respect to the underlying transactions it has acted as one entity with RJA. [DE 19-4 at 1-2 (RJA's Answer filed in the arbitration proceedings using the term "Raymond James" to describe itself as well as the entity with which Chatburn was registered from March to August 2008)] That is the reason why RJFS, upon receipt of the order of the Arbitration panel agreed with defense counsel to file an "answer" on behalf of RJFS. *See* [DE 31-5].

## II.    RJFS DID NOT SATISFY THE REMAINING PRELIMINARY INJUNCTION ELEMENTS.

Even though the District Court did not reach the question of whether RJFS satisfied the remaining injunction elements, RJFS maintains that it did satisfy them. [PB at 49-51] Specifically, RJFS claims it will suffer irreparable harm absent injunctive relief; the weight of the injury to RJFS outweighs any harm to the Investors; and the public interest "heavily favors RJFS." [PB at 50]

RJFS failed to satisfy its burden of establishing these factors. This case is not suited for injunctive relief. An injunction on this record would forever deprive the Investors of their right to arbitrate their claims against the two Raymond James entities that induced them to open the fraudulent investment accounts together. That

37

harm to the Investors is irreparable even if the District Court ultimately determines on a complete record that the Investors were in fact customers of RJFS.

On the contrary, RJFS would still have the opportunity to move to vacate any adverse award in the Arbitration for lack of arbitrability in the unlikely event that it is able to disassociate itself from Chatburn and RJA. And, RJFS suffers no irreparable injury from proceeding in the FINRA Arbitration (which it is presently doing) due to the alleged non-availability in the Arbitration of discovery, motions to compel, and sanctions. All of those mechanisms are available in the Arbitration. Moreover, the Arbitration panel is composed of 3 attorneys who were chosen in part by RJA; and no evidence suggests that RJFS will be put out of business if an award is entered against it.

Lastly, the public interest is not served by allowing RJFS to make an end run around a legitimate arbitration proceeding. Public policy favors the arbitration of disputes, particularly where the facts are undisputed (like here) that the dispute at issue is subject to arbitration. *See Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (discussing the "emphatic" federal policy favoring arbitration) (citation omitted).

## CONCLUSION

The Investors request that this Court affirm the Order in all respects, requiring RJFS to continue participating in the Arbitration.

53684449;4

Respectfully submitted,

/s/ Kristen M. Fiore
KRISTEN M. FIORE, B.C.S. (25766)
AKERMAN LLP
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone:  (850) 224-9634
Telecopier:  (850) 222-0103
kristen.fiore@akerman.com

FRANCISCO A. RODRIGUEZ (653446)
SANDRA MILLOR (13742)
ANDREW J. DOMINGUEZ (112891)
AKERMAN LLP
Three Brickell City Centre
98 SE 7th Street, Suite 1100
Miami, Florida 33131
Telephone:   (305) 982-5591
Facsimile:    (305) 374-5095
francisco.rodriguez@akerman.com
sandra.millor@akerman.com
andrew.dominguez@akerman.com

*Attorneys for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B).  This brief contains 8,914 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Kristen M. Fiore
KRISTEN M. FIORE, BCS

53684449;4

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 30, 2020, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties in this case whom are registered through the CM/ECF.

/s/ Kristen M. Fiore
KRISTEN M. FIORE, BCS

40

53684449;4